# Stong v. PennDOT

C.P. of Lycoming County, no. 98-01,514.

*Gary L. Harris,* for plaintiff.
*Daniel R. Goodemote,* for defendant PennDOT.
*Jefferson J. Shipman,* for defendant Day.

KIESER, *J.,* October 15, 2001—Before the court is plaintiffs' post-trial motions following a jury verdict in favor of defendants, which was returned on May 31, 2001. This court issued an order granting a new trial as to the liability of the defendant Commonwealth of Pennsylvania, Department of Transportation, on October 5, 2001. This opinion is written in support of that order.

This matter arises from a tragic accident, which occurred on September 4, 1998. On this date, plaintiffs' decedent, Robert Stong, age 11, was standing on the east side of a bridge owned by defendant PennDOT. The bridge spans Mill Creek on State Route 2039, Warrensville Road, Loyalsock Township, Lycoming County. Defendant Sabrina Day was the operator of a vehicle which

was crossing the bridge, driving northerly. As Ms. Day's vehicle traveled past him, Robert Stong came into contact with Ms. Day's vehicle and was killed. The jury, in answering special verdict questions, found PennDOT was negligent but held the negligence was not a substantial factor in causing the death of Robert Stong. The jury found defendant Day was not negligent.

The post-trial motion, filed June 8, 2001, as amended August 24, 2001, after transcripts were prepared, asserts that the verdict was against the weight of the evidence and contrary to the law on the holding that PennDOT's negligence was not a substantial factor in causing the death of Robert Stong and that defendant Day was not negligent in the manner of her operation of the motor vehicle. The motion also asserts the court improperly charged the jury in relation to the matter of negligence of the deceased and further asserts a new trial must be granted because of the misconduct of a juror.

## SUMMARY OF FACTS AND EVIDENCE AT TRIAL

The evidence introduced at trial must be viewed in a light most favorable to the defendants as verdict winners. The testimony in many respects was consistent as to the manner in which the accident happened but, not surprisingly, inconsistent as to some details.[1] Robert Stong had missed his school bus and was walking home along Warrensville Road, State Route 2039, when he stopped on a bridge over East Mill Creek. He was standing on the bridge on the downstream easterly side looking into

---

1. The briefs filed by the respective parties detailed the facts and evidence essential to determining the post-verdict motions. The following summary of testimony is largely reproduced from those briefs.

a pool of water. As he stood there, two cars approached the bridge from opposite directions. Defendant Day was the operator of one of those vehicles. She was traveling northerly placing Stong on her right. As both cars met on the bridge, Robert Stong raised up from his position looking over the edge of the bridge and turned to his left, away from the Day vehicle, raising his right leg as if to take a step. In doing so, his body collided with the vehicle being operated by Sabrina Day which propelled him onto the hood of her car causing him to strike the windshield, post and side mirror of her vehicle. He was thrown some 40 feet through the air. This impact caused his death.

The bridge was built in 1938, and uncontested testimony presented by witnesses substantiated the bridge is narrow and there is no walkway for pedestrians, bicyclists or others on the bridge. Testimony established that the bridge had never been widened since its construction, but also that over the years the width of the vehicle cartways had been enlarged and the sides replaced.

The following is a summary of the testimony relevant for post-verdict matters.

## A. *State Police Officer Paul Wilson*

(1) Investigating State Police Officer Paul Wilson, testified to the following: He was the investigating officer and called to the scene of the accident on Warrensville Road on the bridge over East Mill Creek on September 4, 1998. (Trial transcript, p. 3.)

(2) That there were no adverse weather conditions. (Trial transcript, p. 4.) That Sabrina Day was the opera-

tor of a 1987 Chrysler New Yorker and she had been involved in the accident. (Trial transcript, p. 4.)

(3) That he interviewed the driver and made notes of what she told him. (Trial transcript, p. 5.)

(4) That she told him "She was going about 40 miles per hour, she saw Mr. Stong standing along the roadway with his back to the roadway. She slowed and started to swing out along the east side of the road where Mr. Stong was standing, but there was another vehicle coming in the opposite direction so she was unable to swerve that far to the left. As she got to where Mr. Stong was standing, he abruptly turned counterclockwise and *took a step* towards the center of the roadway and into the side of her car." (Trial transcript, p. 6 (emphasis added)— this is the only testimony which indicates the boy may have completed a step before colliding with the car and was not verified by Ms. Day's trial testimony.)

(5) That there were no skid marks on the highway. (Trial transcript, p. 8.)

(6) That the impact occurred on the right side of the vehicle between the door and the back of the right front fender well. That he took measurements on the bridge and that "the distance from the curb along both edges of the bridge was 15 1/2 inches to the fog line which is a solid white line along the side of the roadway. The fog line to the center was 104 inches and in the southbound lane it was 105 inches. (See trial transcript, pp. 10 and 11.)

(7) "On the bridge where the accident occurred there are no sides to the bridge, only guardrails along the sides along the elevated curb." (Trial transcript, p. 12.)

(8) He believes that the distance that the child was thrown at the time of impact to the place where the body landed was approximately 40 feet. (Trial transcript, pp. 13 and 14.)

(9) That the visibility for the Sabrina Day vehicle was approximately 330 feet approaching the bridge and for a period of 300 feet the boy would have or should have been visible to someone approaching from that direction. (Trial transcript, p. 14.)

## B. *Tammy J. Hamilton*

(1) At the time of the accident, she was a passenger in the right front seat of the Sabrina Day auto. (Trial transcript, p. 3.)

(2) Prior to the impact, there was no braking on the part of the automobile. (Trial transcript, p. 5.)

(3) Just prior to the impact, the Stong boy was looking down over the bridge into the water. (Trial transcript, p. 6.)

(4) That the car passing them, coming from the opposite direction, was right there at the same time as the impact with the boy. (Trial transcript, p. 7.)

(5) That Sabrina Day did not swerve at all. (Trial transcript, p. 7.)

(6) That she does not believe that the boy knew that the Sabrina Day vehicle was there. (Trial transcript, p. 7.)

(7) That Sabrina Day did not see the boy; that "she told me she didn't see him; she didn't even know the accident even happened at first." (Trial transcript, p. 8.)

(8) That the boy did not take any steps into the highway. (Trial transcript, p. 9.)

(9) That it looked like he was just getting ready to take a step. (Trial transcript, p. 9.)

(10) That he never lifted his left foot off the ground. (Trial transcript, p. 9.)

(11) That he turned counterclockwise (trial transcript, p. 10), meaning he turned away from the oncoming vehicle that struck him.

(12) "When the Stong boy turned, he turned to his left with his back towards Sabrina's vehicle." (Trial transcript, p. 15.)

## C. *Sabrina Day*

(1) That she was familiar with the highway and traveled it twice a day, five or six days a week for approximately two years; that she was aware the bridge was narrow. (Trial transcript, p. 4.)

(2) That as she approached the bridge, she was traveling 42 miles per hour. (Trial transcript, p. 5.)

(3) There was a vehicle approaching her from the opposite direction. (Trial transcript, p. 6.)

(4) She saw the boy on the bridge as she approached the bridge. That she braked lightly. (Trial transcript, p. 6.)

(5) When she first saw the boy, he was leaning over the bridge and looking down. (Trial transcript, p. 7.)

(6) As she arrived at the bridge, a vehicle from the opposite direction got on the bridge at the same time. (Trial transcript, p. 7.)

(7) At the time of impact, she did not know if she applied her brakes. (Trial transcript, p. 8.)

(8) That when the boy turned from looking into the creek, he turned away from her. (Trial transcript, p. 8.)

(9) That she did not believe the boy knew she was there. (Trial transcript, pp. 8 and 9.)

(10) When she first saw the boy, if she had applied her brakes at that moment, she would have been able to stop before getting to the boy. Answer: "Probably." (Trial transcript, p. 10.)

## D. *John Counts*

John Counts testified by way of deposition taken prior to trial. (See copy of Counts' deposition, plaintiffs' trial exhibit D.)

(1) He was 40 years of age and was employed as a rural route mail carrier for the *Williamsport Sun-Gazette*. He traveled this motor route, State Route 2039, twice a day, every day, seven days a week. (See deposition transcript, pp. 5 and 6.)

(2) That he frequently saw bicycles and people walking across the bridge. (Deposition transcript, p. 7.)

(3) That he frequently saw occasions when two vehicles met on the bridge at the same time. (Deposition transcript, p. 7.)

(4) He witnessed the accident on September 4, 1998, at approximately 4:15 p.m. (Deposition transcript, p. 7.)

(5) Just prior to the accident, he saw the boy leaning over the bridge looking down into the creek. (Deposition transcript, p. 8.)

(6) He saw the boy for a second or two seconds doing this. (Deposition transcript, p. 8.) "What I saw when I looked down towards the bridge he was leaning over looking in the creek. And a car was approaching from the direction. And as the car neared to where the boy was at, the boy stood up in like a quick motion. He stood up and turned counterclockwise and he started to step into the road. Well, from where he was standing there is no side to the bridge. He was on like a concrete abutment or step right there at the edge of the road that the guardrail was laced on. And as he stood up and turned, he walked right into the car. He didn't even take a whole-step. He turned and started to walk; and as he started to walk, he walked right into the side of the car that was approaching from the other direction." (Deposition transcript, pp. 9 and 10.)

(7) He turned counterclockwise (transcript p. 10) and with respect to walking, did he ever take a full step or did he have his leg in the air preparing to take a step? Answer: "Yeah. He was like—his first step into the road. He turned and stepped like in one motion. And he didn't even have a chance to realize that the car was there because he was turning and taking his first step he was walking into the car." (Deposition transcript, p. 10.) When the car struck him what happened to him? Answer: "Well, it kind of bent him over the hood of the car as he walked into the fender. And then once he was bent over the fender, like the hood and the windshield is where he impacted the car mostly; and it knocked him into the car." (Deposition transcript, p. 10.)

(8) The car that struck the child did not seem to slow at all prior to impact but did slow after she struck the child. (Deposition transcript, p. 11.)

(9) That he saw no difference to her speed prior to impact? Answer: "No." (Deposition transcript, p. 11.)

(10) In describing the lanes of travel on that bridge, this witness said "there are two lanes of traffic and then there is the guardrail, there is like no shoulder, there is nowhere for people to walk or anything who are crossing the bridge, or bicycles or anything." (Deposition transcript, p. 11.)

(11) Question: "What did you do after the accident?" Answer: "Well, the woman that hit him—and that's the reason I never think she slowed down before. It didn't seem that she did because when she did slow stop she was down by me, which was approximately 150 feet from where I saw the boy get hit. And she stopped right in front of me. She got out of the car; and she was saying 'What happened, what happened.' And I was right there. I was out of my vehicle already. I said 'You hit that boy.' And she just kind of went goofy. And there was another person with her there in the car. And I said, 'Go see if he's okay.' And there was a house right across the street. I said 'I'm going to call 911.' " (Deposition transcript, p. 12.)

(12) Counsel for PennDOT questioned witness John Counts as follows: Question: "Okay, there has been some testimony and some things produced that indicates that the shoulder is about 18 inches across the bridge, is that about right to you?" Answer: "If it is 18 inches, I would surprised [sic] if it were that wide. Because, like I said, I was across that bridge many times and seen bicyclists and people walking; and, you know, it just—I was always wondering why there was never more room on that

bridge because of the amount of people up and down it." (Deposition transcript, pp. 13 and 14.)

(13) Question: "Okay. And then you testified 'in a quick motion he turned around counterclockwise and took a step?' " Answer: "Yep. Started, to take a step. He never finished. The step he took he walked right into the car." Question: "Okay, where . . . was he still—do you know where he was in relation to the fog line as he took that step?" Answer: "I would say he was probably like right next to it." (Deposition transcript, p. 16.)

(14) Question: "Okay, when you say right next to it, was he on the vehicle side or he—"Answer: "No. He was on the berm side. He wasn't in the actual roadway. But then you are standing on the side of the bridge it is hard not to be." (Deposition transcript, p. 16.)

(15) Question: "As he took the step, did he move into the roadway?" Answer: "I'd say his leg probably crossed into the roadway as he took his step and walked—he walked right into the fender of the car." (Deposition transcript, p. 16.)

(16) Question: "The reason I say that is that you testified that you believed Sabrina Day stayed in her lane of travel." Answer. "Right. I don't think she swerved or slowed down or anything." (Deposition transcript, p. 16.)

(17) Question: "Okay. And then you testified that, I guess Robert impacted the fender first?" Answer: "Right." Question: "Side of the fender. And not sort of bent over?" Answer: "Right." (Deposition transcript, pp. 16 and 17.)

(18) Question: "Okay, do you have any way to estimate how long it took Robert to turn around from the

time he started to turn around until impact?" Answer: "It was like a fraction of a second. It was like a heartbeat, he stood up turned and——." (Deposition transcript, p. 17.)

(19) Question: "Did you see Robert look towards his left in the direction that Sabrina Day was coming?" Answer: "No, he had no idea the car was—if he had any idea—because he showed no hesitancy that, you know, a car—he might have thought a car was right there or coming or anything. He just up and turned and the car was there, and he never knew it." (Deposition transcript, pp. 17 and 18.)

(20) Question: "Okay, if Robert did not turn and step toward the bridge, do you believe that the Day vehicle would have impacted him?" Answer: "I believe it may have. It is hard to say because there is that little bit of room there." (Deposition transcript, p. 19.)

(21) Question: "Was there a vehicle approaching from the other direction?" Answer: "Yeah. There was one that was passing that other vehicle about the same time that she hit the boy." (Deposition transcript, p. 21.)

(22) Question: "Well, if there was another vehicle on the bridge at the same time as the Day vehicle, would she have had any time to swerve to begin with?" Answer: "I don't believe so." (Deposition transcript, p. 22.)

E. *Lance Robson—Plaintiff's Expert*

After giving his credentials and explaining the American Association of State Highway and Traffic Officials Standards and Standards of the Transportation Research Board, and indicating that he had performed an investigation of this particular bridge and researched and re-

viewed data pertaining to bridges in Pennsylvania, Lance Robson P.E., rendered his opinion as to how the accident occurred and what caused it.

(1) "The lanes are narrow and there's very small shoulders, very narrow shoulders across the bridge. This is a dangerous condition for anyone—anyone walking or riding a bicycle on the bridge. This particular danger has been known for a number of years, at least since 1974 it has been known." (Trial transcript, p. 7.)

(2) "Shoulders, adequate shoulders are an essential component of the roadway and available to use as a roadway, including pedestrians. From my documents that I have available, PennDOT has recognized the need for adequate shoulders across bridges since at least 1954." (Trial transcript, p. 7.)

(3) "If the full lane width and minimum shoulder width would have been available on the bridge, this crash would not have occurred. The happening in this collision, this event, is consistent with the kind of crashes that are foreseeable when you have narrow roadway widths, and narrow shoulders. Additional clear roadway width could have been provided in 1992 when the parapet was reconstructed." "Finally, the substandard lane and shoulder width on the bridge was a recognized dangerous condition, which restricted the ability of both the driver and pedestrian to avoid the crash was contrary to long established standards and caused this crash." (See trial transcript, pp. 7 and 8.)

(4) Lance Robson described among other things the actual bridge itself, that it was constructed in 1938, at that time the highway was only 16 feet in width, the width of the bridge itself was 22 feet. (Trial transcript, p. 9.)

(5) That in 1974 the average daily traffic flow on this highway was 1,300 vehicles per day. (Trial transcript, p. 11.)

(6) In the year 2000 the average daily traffic flow was in the neighborhood of 4,300 vehicles per day or 4,272 to be specific. (Trial transcript, p. 11.)

(7) That the average daily traffic count has tripled since 1974. (Trial transcript, p. 17.)

(8) That narrow bridges are a recognized hazard. (Trial transcript, p. 18.)

(9) That the travel lanes on this bridge are not of sufficient width (trial transcript, p. 20), "the actual lane width across the bridge are 10 feet and 9 feet, where as they should be in the order of 12 feet." (Trial transcript, p. 20.)

(10) "Shoulders are not part of the traveled way, but they're available for emergency maneuvers, they're available for pedestrians, they are an important safety part of the roadway." (Trial transcript, p. 20.)

(11) "Well, if someone is faced with oncoming traffic, for instance, and they go to their right, if they have a three foot shoulder or wider shoulder they have more room for recovery before they hit something that's going to become a problem. Also, the shoulder width is the place where pedestrians and bicyclists can go." (Trial transcript, p. 21.)

(12) That when this bridge was originally constructed in 1938, the bridge was wider than the roadway. (Trial transcript, p. 21.)

(13) Question: "What has happened since then?" Answer: "What's happened is that as the road was widened

the road was originally 16 feet and then it's been widened, the first time I see it is 18 feet and the next time I see it's 20 feet, this is the pavement, so as it was widened then the shoulder was cut out on the bridge and reduced as the roadway was striped across the bridge to try to be consistent with the increased pavement width on the approaches." (Trial transcript, p. 21.)

(14) Question: "Does the engineering community have a consensus as to the importance of shoulders is?" Answer: "Yes. Well, in 1965, for example, ASHTO said well designed and properly maintained shoulders are necessary on rural highways with any appreciable volume of traffic. They're more important if advantages are as follows, and one of them is of the advantages is space is provided to escape potential accidents or reduce their severity. In the same publication shoulders are essential for safety. The need for adequate shoulders increases with traffic volume and the speed of the highway where there is appreciable traffic volume roads with narrow surfacing and service give poor service have high accidents. These are typical comments." (Trial transcript, pp. 21 and 22.)

(15) Question: "Okay, what about separation of motorists and pedestrians?" Answer: "Yes. The Transportation Research Board in 1987 published a special report and it was designing—the title of the report was 'Designing safer road surfacing, restoration and rehabilitation.' This report stated wide lanes and shoulders provide motorists increased lateral separation, important factors in sideswipe and head-on accidents. That's what this was, this was a sideswipe accident." (Trial transcript, p. 22.)

(16) Lance Robson indicated statistics show the two most important factors in reducing or eliminating side-swipe accidents on bridges is to increase the width of travel lanes and increase the width of shoulders. (Trial transcript, p. 23.)

(17) Lance Robson rendered an opinion and explained the relationship between the narrow lane widths and narrow shoulders on the subject bridge in the accident, which occurred. "Well, Ms. Day said that she moved as far to the *right* as she could, so that means that if there would have been more room there she wouldn't have had to encroach to the edge or to the shoulder or wherever the exact impact occurred. So, if she had had more room she wouldn't have moved to the right, she could have just stayed where she was, but she moved to the right in response to the oncoming vehicle." (Trial transcript, pp. 23 and 24 (emphasis added)—the statement that Mr. Robson made as to Ms. Day moving to the "right" could have been interpreted either as a misstatement by him or evidence that she did move to the right.)

(18) Question: "How about the child, the comments of the child? You've read what the witnesses have said?" Answer: "Yes, my understanding is that he was learning [sic] over the rail and then he turned in the direction away from the oncoming car and as he turned he appeared to have taken half a step or so or at least have started to step. If there had been three feet of shoulder there he would have had all that additional space in which to see the oncoming vehicle and to have reacted to it. So to me it's directly related to—to the current—the narrow shoulder directly related to the impact that occurred." (Trial transcript, p. 24.)

(19) Lance Robson testified that although the bridge comported with standards when it was built in 1938, since 1954 the bridge width and shoulder width did not comply with PennDOT's standards. (Trial transcript, p. 25.)

(20) PennDOT recognized the bridge as being a narrow bridge since 1985 and assigned it as such. (Trial transcript, p. 27.)

(21) PennDOT documentation showed that in March of 1992, the original pigeonhole parapet was removed and concrete curbs were installed. (Trial transcript, p. 33.)

(22) This construction was done pursuant to a bridge safety program. No traffic or engineering studies were done as part of the decision to construct the curb. (Trial transcript, p. 33.)

(23) Question: "Mr. Robson, what is the significance of a traffic and engineering study?" Answer: "Well, that provides you with a review of what's going on, what the traffic volumes are, what the physical conditions are, and what you should be doing. There's two—two opportunities, one before you start, and start to work, and two, if the work doesn't proceed as you planned, if there's some change in the work." (Trial transcript, p. 34.)

(24) Question: "What were your personal observations about the traffic at the time that you did your investigation?" Answer: "What I observed is that when traffic was opposing me, they would go two or three feet in the opposing lane to leave a proper buffer for me." (Trial transcript, p. 34.)

(25) Question by Mr. Shipman (counsel for Sabrina Day): "Okay, if understand your testimony, it was a

substandard conditions of the roadway, *i.e.,* the narrow width of the lane and the narrow shoulder that had developed over the course of the years that caused the collision of the boy and the car; is that right?" Answer: "Right, because she could not move further." Question: "In your report you're not in any way critical of the manner of driving of Ms. Day, correct?" Answer: "That was not part of my scope of work." (Trial transcript, p. 40.)

(26) Question: "When you say, sir, it wasn't within your scope of work, what do you mean?" Answer: "My focus, if you'll look at the report, was to determine if there were dangerous roadway conditions that were the cause of the crash." Question: "So you were—"Answer: "In other words, I didn't evaluate the driver's actions." (Trial transcript, p. 40.)

## F. *Atwood Welker*

In addition to the testimony of Lance Robson P.E., plaintiffs called Mr. Atwood Welker, professional engineer and former district engineer for PennDOT, District 3-0. Mr. Atwood Welker was retired from the Pennsylvania Department of Transportation and was the manager of Loyalsock Township at the time of trial. State Route 2039, segment 50 offset 0, is the sight of the accident in an area running through Loyalsock Township. Mr. Welker addressed a letter to PennDOT dated January 12, 1999, wherein he indicated the following: "As you are aware, the bridge is narrow, on both vertical and horizontal curves, has high traffic volume 4,300 ADT, (average daily traffic) and is very hazardous for bicycle and pedestrian traffic." Mr. Welker also testified that he was not familiar with the facts of this accident when he wrote the letter.

## G. *Rebecca S. Burns*

The only witness called by PennDOT was Rebecca S. Burns, civil engineer and employee of PennDOT. After establishing her credentials and the basis for her to render an expert opinion, Ms. Burns indicated that she was the assistant chief bridge engineer for the Commonwealth of Pennsylvania. Ms. Burns testified most significantly as follows:

Question: "just because an existing facility doesn't meet current design standards, that doesn't mean it is unsafe?" Answer: "That is absolutely correct." (Trial transcript, p. 7.)

Otherwise, she did not testify or render an opinion that the condition of the bridge was not a dangerous condition.

## SITE VIEW

A site view of the bridge itself was held. The jurors were given the opportunity to actually walk across and view the bridge as well as the highway approach to the bridge and locations testified to by the various witnesses.

"Counsel admits that there is nothing on the record except for the court advising the jury to be active participants in the trial and to ask for a recess if they need one to help them to pay attention. Transcript of testimony of Lance Robson, pp. 25-26. Plaintiff failed to move for the removal of jurors who were allegedly sleeping, nor did plaintiff ask for an inquiry to determine whether any juror was sleeping or missed any testimony. Other than the one instance cited above, this issue was not raised at any other time."

## DISCUSSION

A decision to grant a new trial lies within the discretion of the trial judge. *Martin v. Evans,* 551 Pa. 496, 711 A.2d 458 (1998), also, *Dierolf v. Slade,* 399 Pa. Super. 9, 581 A.2d 649 (1990). A jury verdict will not be set aside in absence of clear error of law or palpable abuse of discretion. *Sundlun v. Shoemaker,* 421 Pa. Super. 353, 617 A.2d 1330 (1992). "A reviewing court may not reweigh evidence, and a new trial may not be granted merely because the jury could have drawn different conclusions or inferences." *Sundlun v. Shoemaker* at 361, 617 A.2d at 1334-35. (citation omitted)

The law that applies in this case authorizes the court to grant a new trial under the very limited standard of doing so only where the verdict is so against the weight of the evidence as to shock a trial judge's sense of justice, because the result of upholding a verdict would be a miscarriage of justice. The Pennsylvania Supreme Court, in applying this standard has stated:

"This court has repeatedly emphasized that it is not only a trial court's inherent fundamental and salutary power, but its duty to grant a new trial when it believes the verdict was against the weight of the evidence and resulted in a miscarriage of justice. *Burchard v. Seber,* 417 Pa. 431, 438, 207 A.2d 896, 899 (1965); *Frisina v. Stanley,* 409 Pa. 5, 7, 185 A.2d 580, 581 (1962); *Kiser v. Schlosser,* 389 Pa. 131, 133, 132 A.2d 344, 345 (1957). Although a new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion, a new trial should be awarded when the jury's ver-

dict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *Burrell v. Philadelphia Electric Company*, 438 Pa. 286, 265 A.2d 516 (1970)." *Thompson v. City of Philadelphia*, 507 Pa. 592, 598, 493 A.2d 669, 672 (1985).

"True it is that the assaying of the credibility of witnesses and the resolving of conflicts in their testimony are for the jury. But it is equally true that the trial judge may not hide behind the jury's verdict; he has a duty to grant a new trial when he is convinced that the judicial process has resulted in the working of an injustice upon any of the parties." *Kiser v. Schlosser*, 389 Pa. 131, 133, 132 A.2d 344, 345 (1957).

It is therefore with great caution that this court would invade the province of the jury and disturb its verdict. Over the years this has been a power that has been very seldom exercised by this court. Nevertheless, in this case, to avoid an injustice to plaintiff the court finds it necessary to grant a new trial as would relate to the liability of the defendant PennDOT.

Most significantly, this result is required based upon this court's experience in this case as it received and reviewed the special verdict form from the jury. Upon inspecting the verdict before it was read in open court, this court was not shocked by the jury having found PennDOT negligent, but was shocked upon reading the jury had concluded that PennDOT's negligence was not a substantial factor in causing Robert Stong's death. Listening to the witnesses during the course of the trial and considering the evidence carefully, as the charge was prepared and delivered to the jury, it became apparent

the jury could reach a verdict on the issue of negligence that would either favor plaintiff against both defendants or against one of them or would completely favor defendants because the jury had several fact issues to resolve. However, once negligence was established, this court cannot understand under the facts and the law as to how such negligence could not be a substantial factor in causing the accident and resulting death of Robert Stong.

During the trial the court had found significant the (deposition) testimony of witness Counts about the narrowness of the bridge and that the boy's knee or leg was struck by the side of the car throwing him onto its hood. According to Counts, Robert Stong never completed a step, with his leg possibly crossing the fog line. Counts indicated the boy's movement, and his being struck, occurred in less than a second and further that Stong may have been struck even if he had not moved due to the narrowness of the bridge. In addition, the testimony of witness Hamilton verified that the boy never had an opportunity to take a step but only raised his leg in preparation for a step. Finally, Lance Robson's testimony that the bridge's dangers were known to PennDOT and that the substandard width hindered the ability of the driver Day and the pedestrian Stong to avoid the crash, was not refuted by the testimony of PennDOT's expert Rebecca S. Burns nor any other testimony.

The testimony and site view led the jury to find that PennDOT was negligent. Such a determination is clearly and firmly supported by the evidence. There was no denying the fact that PennDOT was very much aware of the heavy traffic use of this bridge, its use by pedestrians and bicycles and its extreme narrowness as it had con-

tinuously widened the traffic lanes since the bridge had been constructed in 1938 to accommodate the increased traffic and the increased width of automobiles. As a result the width between the edge of the rebuilt sides of the bridge to the fog line that marked the edge of the traveled lanes for vehicles had been reduced to 15 1/2 inches. There are many bases upon which PennDOT could have been negligent. One of the most obvious is that they did not provide for adequate width for pedestrian and non-motor vehicle travel across this well-used bridge. Given the high volume of traffic, over 4,700 vehicles per day, it was certainly obvious to PennDOT that vehicles would pass by each other as they crossed the bridge. PennDOT was also likely aware of the way custom vehicles had of driving into the opposite lane when passing by a pedestrian or bicyclist as testified by Mr. Robson. The jury view no doubt confirmed this reality.

Therefore, it was no surprise to this court to open the verdict slip and read the determination that PennDOT was negligent. It did, however, come as a shock to this court to find the jury indicate this negligence was not a substantial factor in causing Robert Stong's death, particularly when the jury also found Ms. Day was not negligent. If the jury found, as it must have, that she did all she could to avoid the accident, including driving as far to the left as the bridge and traffic permitted, then the bridge's narrow width had to be a legal cause of the accident.

The testimony was clear that the child had lifted his leg preparatory for stepping but had not even taken one step onto the road when his raised leg was impacted by the Stong vehicle. Additionally, all three eyewitnesses

testified that they did not believe Robert Stong knew that the Sabrina Day vehicle was approaching him on the roadway. The state police officer testified that there are "no sides to this bridge." Witness Counts testified that the bridge has no place for pedestrian or bicyclists, Sabrina Day herself, who traveled the road frequently in the two or three years of her employment in that area testified that she knew the bridge was narrow. These witnesses all noted in their testimony the unsafe condition of the bridge, the narrowness of the bridge, the inadequacy of the bridge and the lack of shoulders and pedestrian or bicyclist walkways on the bridge. All these witnesses were quick to note these conditions without prompting as a clear indication the bridge was not a negligible or incidental factor in causing the accident. Instead, the testimony of these witnesses clearly indicated the substantial way in which this factor contributed to the accident. Certainly had there been anything near a sufficiently wide walkway for Robert Stong to be on, his turning and lifting a leg without even taking one step would not have resulted in his being struck by Ms. Day's automobile.

Plaintiffs' two additional witnesses, as to PennDOT's liability and causation, Lance Robson, professional engineer, and Atwood Welker, former district engineer for District 3-0 of PennDOT, were not really controverted by PennDOT's evidence concerning causation. Where there is conflicting testimony, a jury is entitled to pick and choose those facts and the version which they prefer. However, the record is totally devoid of any contrary causation evidence which could lead a jury to believe that the dangerous condition of the bridge was not a legal cause or substantial factor.

There is no question that in walking across the bridge, Robert Stong was making proper use of the bridge. There is no question that in doing so he stopped to look over the side of the bridge, as a person of any age may be prone to do. The boy then made a turn and raised his leg. Was he going to cross the highway? Was he going to proceed on his path to the end of the bridge? Was he startled by the close proximity of Ms. Day's automobile, which he had not previously seen? Unfortunately, we will never know. It is also clear, however, that such a turn by any individual, within a space of 15 1/2 inches, cannot be made in safety and with two vehicles being alongside of such person on the bridge. The site view also demonstrated the use of the full 15 1/2-inch width by a pedestrian would be difficult due to the design of the bridge curb and railing making the functional use area about 12 inches to the right of the fog line. Mathematically, the total width of cars and available areas between the fog line might make it technically possible for two cars to park along side of each other and a person stand next to them, in safety, without touching and some safe distance separating them. In the real world, however, vehicles passing each other and pedestrians and pedestrians walking may not use only the minimum space necessary but require something more than that without driving or walking in an unreasonably safe manner.

In this court's view, it cannot be that the negligent narrowness of the bridge did not act as a substantial factor in bringing about the accident. It would be virtually impossible for any person in Robert Stong's position to have made the movement he did without being struck when two cars are passing adjacent to the person even if

this movement was to be done in a properly cautious manner.

PennDOT consistently maintained that the sole cause of the accident was the failure of Robert Stong to look before he entered the roadway, thereby walking directly into the side of Ms. Day's vehicle rather than the narrowness of the bridge. These arguments were made in earnest throughout the trial. It is certainly possible in this case that the jury determined that PennDOT's negligence was not a substantial factor because they looked ahead to the issue as to whether the child himself was negligent. There was certainly sufficient evidence in the case to indicate Robert Stong was negligent in not keeping an appropriate lookout for traffic, and that he may also have been negligent in stopping on the bridge to look, and in not walking only within the 15 1/2 inches allotted for the walkway, and in sticking his leg across the fog line and coming into contact with Day's automobile. If, in fact, the jury found that he had failed to yield the right-of-way in the act of crossing the highway at that location, they also would have been compelled to find him negligent as a matter of law. While there was evidence to support the child was negligent and that his negligence also was a substantial factor in causing his own death, nevertheless, that evidence cannot be used by the jury to exonerate PennDOT under the theory that their negligence was also not a substantial factor. Rather, what our law requires is that the jury proceed to a determination as to comparing the negligence that they did find to be a substantial factor in the child's death. It may be that a new trial will result in the same eventual finding of no liability on the part of PennDOT, however,

plaintiff is entitled to have a jury make that essential determination.

As to legal cause the court charged the following at transcript pages 12, 13 and 18:

"(P. 12) In order for the plaintiff to recover in this case, the defendant's negligent conduct must have been a substantial factor in bringing about the accident. This is what the law recognizes as legal cause. A substantial factor is an actual, real factor, although the result may be unusual or unexpected, but it is not an imaginary or fanciful factor or a factor having no connection or only an insignificant connection with the accident.

"There may be more than one substantial factor in bringing about the harm suffered by the plaintiff. By negligent conduct, if two or more persons contribute to an occurrence or incident, each of these persons is fully responsible for the harm suffered by the plaintiff regardless of the relative extent (P. 13) to which each contributed to the harm. A cause is concurrent if it was the operative moment of the incident, and acted with another cause as a substantial—contributive factor in bringing about the harm.

"Even if you find that Robert Stong was negligent, you must also determine whether the defendants have proven that Robert Stong's conduct was a substantial factor in bringing about his injury. If the defendants have not sustained that burden of proof, then the defense of contributory negligence has not bee [sic] made out.

"(P. 18) In deciding if the defendant's conduct was a legal cause of the injury to Robert Stong, you must determine whether it was a substantial factor in contribut-

ing to the injuries he sustained and his ultimate death. The question is, did it have such an effect in producing the injury as would lead you, as reasonable people, to regard it as a cause, using that word in the popular sense, there may be more than one such causes. [sic]

"A defendant's negligence is the legal cause of a plaintiff's injury as long as it was a substantial factor in bringing about the injury.

"(P. 20) The mere fact that a plaintiff crosses between intersections is insufficient to prove contributory negligence."

Therefore, this court correctly charged the jury on the issue of substantial factor and did so in accordance with the agreement of the parties and also in accordance with the Standard Civil Jury Instructions. Nevertheless, the jury's finding of lack of substantial factor reveals a lack of comprehension of the law of "legal cause" and "substantial factor." It may be this court must find a clearer way of presenting the law to the jury.

The Pennsylvania Supreme Court in *Ford v. Jeffries,* 474 Pa. 588, 379 A.2d 111 (1977), states that the proper way to determine the issue of the defendant's negligent conduct being the legal cause of an accident is to compare whether it is a substantial factor or cause versus being an insignificant cause or negligible cause under the provisions of section 431, Restatement (Second) of Torts. This court cannot conceive how the bridge in question with virtually no walkway or pedestrian safeguard, coupled with its high traffic count, could be said to be insignificant in bringing about the occurrence of this accident. Under the distinction between substantial cause and simply a cause in fact (or non-legal cause) the Re-

statement makes it clear that "substantial" is viewed to denote the fact that defendants' conduct has the legal effect of producing the accident compared to the event or negligence being so insignificant that no ordinary mind would think of it as a cause. The testimony and the bridge itself demonstrate that cannot be said about the bridge in this case. See *Ford, supra* and Restatement (Second) of Torts §431, including comment A. This is certainly not a case where the bridge merely facilitated the accident because it happened to be the location where Robert Stong and Ms. Day's car made contact, however, the jury's verdict has the effect of reducing the bridge to being just such a mere factual cause. For instance, if the bridge had a proper pedestrian way but nevertheless Ms. Day had crossed the fog line or driven onto a proper pedestrian way then the bridge would have merely been a cause in fact, that is, that it was the place where the deceased just happened to be when the driver's negligence brought about the accident. Rather, in this case, the accident occurred because the bridge prevented Ms. Day from giving the boy proper clearance, so that in making a normal movement the boy would not have been struck.

Stated another way, if the negligent act created or increased the risk of a particular harm, and that harm did come about, the negligent act should be regarded as a substantial factor. See *Ford,* sections 435 and 442(b) Restatement (Second) of Torts, comment B, "If one engages in negligent conduct toward another such as unreasonably increasing the risk that the person will suffer a particular kind of harm it cannot be said, as a matter of law, that the actor is not liable simply because the foreseeable plaintiff suffered the foreseeable harm *in a manner*

which was not foreseeable. *Ford, supra* at 596, 379 A.2d at 115. (emphasis in original)

This does not mean that PennDOT's liability to plaintiff is absolute. The jury could very well have concluded from the evidence presented that Robert Stong was also negligent in that he—did not look before moving from the bridge rail; failed to yield the right-of-way to the Day vehicle; should not have stopped upon the bridge; moved across the fog line into the side of the Day vehicle. The jury could also have legitimately found that such negligence by Stong was also a substantial factor in causing the accident and his own death and very well under the law may have been required to make such a finding. It then would have had to apportion the causal negligence between PennDOT and Stong and in doing so might very justifiably have concluded Stong's negligence exceeded 50 percent of the total causal negligence, thus exonerating PennDOT. Such rationale appears to this court to be the only explanation of the jury's verdict but if so it is not in accordance with the law. The jury was required to make a comparison of the causal negligence and to render its verdict accordingly.

Although plaintiffs are entitled to a new trial as to PennDOT, the jury's verdict that defendant Sabrina Day was not negligent must be upheld. The jury resolved the factual issues relating to defendant Sabrina Day, driver of the automobile, to indicate that she did not act in a negligent way in operating her vehicle. This determination was based upon substantiated evidence to that effect. Under the evidence as presented to the jury, the jury could have concluded one of several possible factual scenarios, including: (a) that Sabrina Day never saw the

child until she struck him; (b) that she saw the child as she testified, but took little or no evasive or precautionary action to avoid striking the child; (c) she saw the child. She braked lightly and moved as far to the left as she could have without striking the other car and in doing so drove prudently as a reasonable driver would do under the circumstances (PennDOT's negligence was obviously one of those circumstances, *i.e.,* they may have considered that the bridge width severely limited Ms. Day's ability to avoid the accident). Obviously, the jury chose the latter or a variant thereof, which they were entitled to do.

Plaintiffs also assert that defendant Day must have been negligent because of statements, which alluded to her not having seen or observed the child, but such was contrary to the evidence she gave herself at both trial and deposition prior to trial. She clearly indicated she had seen the child start to turn, meaning certainly that she had kept her eye on the child and that as she saw the child turn and was able to note the child had not looked in her direction at all but was turning away from her. It was at about that point she was immediately alongside of the child with the front of her automobile. It is clear from all the testimony that the child impacted into the side of the Day automobile at a point somewhere between the right front wheel and the right front passenger door. Under the testimony of all the witnesses it is very easy to conclude that Ms. Day would not have seen the actual impact between her car and the boy, Robert Stong. This could very well have accounted for and been the source of her emotional statements after the accident, asking,—"What happened?"—and stating—"I didn't see

him." It is also clear that the child made some type of motion that took at least part of his body towards the traveled portion of the highway and that in all probability he placed, through his turning movement, at least one leg into the lane of travel. Under all those circumstances it was up to the jury to determine whether or not Ms. Day had maintained reasonable proper lookout for the safety of the child.

The jury must have accepted the credibility of defendant Day as she gave her testimony. The court observed that while Ms. Day's testimony was brief and to the point, she nevertheless delivered it in a convincing way. Her testimony clearly permitted the jury to conclude that she saw the child and took note of his position, which at that point was not necessarily one of peril. That as she proceeded across the bridge, she did so in an appropriate manner, moving as far as she reasonably could to the left and away from the position of the child on the bridge, with her moving to the left being limited due to an approaching automobile and the narrowness of the bridge. The jury had a chance to view the bridge and the approaches and the amount of time that defendant Day as the driver would have to observe and make such judgments. The evidence and the testimony was sufficient to support the finding Ms. Day operated prudently.

## CHARGE TO THE JURY ON THE NEGLIGENCE OF THE DECEASED

Plaintiffs seek a new trial asserting that over timely objection, the court prejudicially and erroneously charged the jury on the duty of a pedestrian crossing between intersections.

The portions of the court's charge relevant to this aspect of the post-verdict motions include the following from pages 20-22:

"(P. 20) Another section of the Motor Vehicle Code that you may find would apply to this case would be that under section 3563(a) of the Vehicle Code. That section provides in pertinent part as follows: every pedestrian crossing a roadway at any point other than within a crosswalk at an intersection or any marked crosswalk shall yield the right-of-way to all vehicles upon the roadway. Thus, if you would find that Robert Stong violated this section of the Vehicle Code then you must find that Robert Stong acted negligently in this case.

"A duty to exercise ordinary care to keep a proper lookout involves not only the duty to look when such looking would be effective, but also the duty to see what an ordinarily prudent person exercising ordinary care would have seen under the circumstances then and there existing, and a person who keeps a look-out but fails to take advantage of what that reasonable look discloses is as negligent as one who failed to keep a look-out.

"One who is operating a vehicle upon the highway is under a duty to be continuously alert, to perceive any warning of danger that is reasonably likely to exist, and to have one's vehicle under such control that injury to persons or property can be averted.

"The mere fact that a plaintiff crosses between intersections is insufficient to prove contributory negligence. The driver of an automobile on a public highway is guilty of negligence if the driver in the exercise of due care (P. 21) fails to control his or her vehicle in such a way as to avoid striking and injuring a child who is in a place of

danger or where there is a reasonable apprehension that a child might run into a place of danger for a sufficient amount of time for the driver to observe the child and bring his or her vehicle under control. Where there is a reasonable apprehension that a child might run into or move into a place of danger of injury by an automobile, there is a duty imposed on the operator thereof to exercise a higher degree of care then under ordinary circumstances; and to have the car under such control that it can be stopped on the shortest possible notice that harm may be inflicted."

If the child should come suddenly into the path of the moving automobile so that an attentive driver who's exercising due care under the circumstances cannot, in all reason, avoid colliding with the child, the driver is not liable for the damages resulting as the driver would not be negligent. In other words, it is necessary for the evidence in the plaintiffs' case to establish that the child was visible to the driver for a sufficient length of time so as to give the driver a reasonable opportunity to avoid the accident. Plaintiff asserts that the jury charge instructed the jury to find negligence if they found Robert Stong was crossing at a place other than at a crosswalk. Such a charge would be error under the cases cited by plaintiffs. Plaintiffs contend that "both the Supreme and Superior Courts, in considering the effect of this [language], have repeatedly held that the mere fact that a plaintiff crossed between intersections is insufficient to establish negligence on the part of the plaintiff." *Bressler v. Dannon Yogurt,* 392 Pa. Super. 475, 482, 573 A.2d 562, 566 (1990), citing to *McKniff v. Wilson,* 404 Pa. 647, 650, 172 A.2d 801, 803 (1961). This court so charged

the jury, using that specific language as requested by plaintiff. However, the court did not so charge the jury. The jury was instructed to find negligence if Robert Stong failed to yield the right-of-way to vehicles on the roadway. The trial court in *Bressler* charged the jury that the mere act of crossing outside a crosswalk was negligence. *Bressler v. Dannon Yogurt,* 392 Pa. Super. 475, 481-82, 573 A.2d 562, 565 (1990). The court did not so instruct the jury in this case; plaintiffs' assertion is meritless.

Moreover, plaintiffs' objection does not go to the verdict he challenges. The jury found that PennDOT's negligence was not a substantial factor in causing plaintiff's harm. Therefore, they did not reach the specific question of whether Robert Stong was negligent.

## JURY MISCONDUCT

Plaintiffs raised the issue of jury misconduct in their motions for new trial. As stated in plaintiffs' brief at pages 29-30:

"Counsel can point to no specific evidence of misconduct, either between trial counsel and jury members and, of course, has no knowledge of the deliberations, which took place in the jury room. Counsel would like to point out to the court, however, and ask the court to remember that more than one juror was found sleeping on more than one occasion. The only record of this appears in the trial transcript of Lance Robson, beginning at page 25 and following again at page 26, where the court urged the ladies and gentlemen of the jury to be active participants and to pay attention. It should be noted that the witness at that time, Lance E. Robson, had begun his testimony at 8:51 a.m. and the court found it necessary

to call a recess at 9:35 a.m., approximately 44 minutes later. Additionally, the court is asked to recollect the demeanor and behavior of one of the jurors who later was selected as the foreperson in her conduct when she was chosen for the jury.

"Counsel has no direct evidence of any improprieties on the part of the jurors, but based upon the verdict rendered by the jury which plaintiff believes to be totally inconsistent with the law and the evidence, it does appear that there was a lack of interest and a lack of diligence applied to the deliberation process on the part of this particular jury."

There is absolutely no evidence to support plaintiffs' assertion that the jury lacked interest in the case or exhibited a lack of diligence. Moreover, there is no evidence that the jury's verdict was reached by any method other than through the careful performance of their duties as jurors as instructed by the court. Other than his disagreement with the verdict itself, plaintiffs' counsel offers no evidence that the verdict was reached improperly. Moreover, the mere appearance of dozing may not be taken as clear indication that an individual is asleep and is missing relevant testimony. *Commonwealth v. Jones,* 530 Pa. 591, 610 A.2d 931 (1992); *Rural Area Concerned Citizens Inc. v. Fayette County Zoning Hearing Board,* 166 Pa. Commw. 520, 646 A.2d 717 (1994).

While the decision to remove a juror because of inability to perform the usual functions of a juror is usually within the sound discretion of the trial court, the exercise of this judgment must be based on a sufficient record of competent evidence to sustain removal. *Commonwealth v. Saxton,* 466 Pa. 438, 353 A.2d 434 (1976).

Plaintiff did not seek an inquiry during the trial and, therefore, may not challenge the verdict on the basis of juror misconduct now.

Plaintiffs are not entitled to a new trial due to alleged juror misconduct. Plaintiffs claim that there was jury misconduct. Specifically, plaintiffs claim there were members of the jury who slept during the trial testimony. Further, the jury foreperson allegedly acted angrily upon being selected for jury service. At no time did plaintiffs raise any objection to the selection of the jury foreperson. At no time did plaintiffs raise any objection when jurors were allegedly sleeping during trial testimony. Plaintiffs cannot complain of this alleged jury misconduct when there was no objection made at the time of the alleged misconduct, nor is there any evidence to support there was misconduct by any juror. Therefore, plaintiffs' motion for new trial on this issue is without merit.

## CONCLUSION

A new trial is warranted as to the liability of Commonwealth of Pennsylvania, Department of Transportation, defendant.